GEORGINA PRIETO, by herself and as mother with patria potestas over her children GEORGINA MARÍA, CELIA MARÍA, HÉCTOR, and JOSÉ RAMÓN PIÑERO PRIETO, Plaintiffs and Appellants, v. MARYLAND CASUALTY CO. and EDWIN V. GOSS, Defendants and Third-Party Plaintiffs and Appellees, v. TRANSPORTE METROPOLITANO, INC. and UNITED STATES CASUALTY CO., Third-Party Defendants and Appellees.

No. R-515.        Decided February 12, 1970.

584

Félix Ochoteco, Jr., for appellants. Rivera Zayas, Rivera Cestero & Rúa for appellees. Luis E. García Benítez for Transporte Metropolitano, Inc. Emilio de Aldrey for United States Casualty Company.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

We reviewed the final judgment of the Superior Court, San Juan Part, which dismissed a claim for damages filed by Georgina Prieto, widow of Piñero. per se, and as legal repre-

sentative of her minor children Georgina María, Celia María, Héctor, and José Ramón Piñero Prieto, against Edwin V. Goss and the insurer Maryland Casualty Co.

The trial court in its statement of the case and in its findings of fact described the accident which caused the death of engineer Héctor Piñero and the subsequent case brought by his heirs, as follows:

### "Statement of the Case, Findings of Fact and Conclusions of Law

"The above-entitled case was filed by Georgina Prieto widow of Héctor Piñero and the children of both named, Georgina María, Celia María, Héctor, and José Ramón Piñero Prieto, claiming damages for the death of her husband against Edwin V. Goss, and Maryland Casualty Co., alleging in synthesis: that a power shovel, property of defendant and insured by the other co-defendant against damages to third-persons, and which had a defect in the mechanism of its brakes which handled the bucket, caused the death of plaintiffs' predecessor when the edges of the teeth of the above-mentioned bucket fell on his body, and claiming from defendants $100,000.00 for the damages that the above-mentioned death caused to plaintiffs.

"Defendants filed a joint answer denying all liability in the aforementioned accident and filed a third-party complaint against the corporation Transporte Metropolitano, Inc., and its insurer U.S. Casualty Co., claiming that the one liable for said death was Transporte Metropolitano, Inc., which had been hired for the transportation of the above-mentioned power shovel which in turn Héctor A. Piñero had leased from defendant Edwin V. Goss, it being alleged that the predecessor's death was due to the fault and negligence of the third-party defendant because of the negligent manner in which it performed the transportation.

"The third-party defendants answered the third-party complaint denying all liability in the aforementioned accident.

"    .       .       .       .       .       .       .       .       .

### "Findings of Fact

"That Héctor A. Piñero, Civil Engineer, leased from defendant Edwin V. Goss, a power shovel to be used for the extraction

of sand in the project of the bypass of the Loíza highway, work which was being performed by Piñero as such engineer through public bidding:

"That in order that the above-mentioned shovel could perform the work for which it had been leased, they had to change the attachment known as the front-shag or dragline with which it was being used by the P.R. Aggregates, substitution which was performed by the employees of defendant Edwin V. Goss.

"That since engineer Héctor A. Piñero was in a hurry to use said power shovel, he called the offices of Transporte Metropolitano, Inc., and asked them to transport said shovel to the place where it was going to be used, Mr. Goss' employees delivered the above-mentioned shovel to a 'trailer' or heavy motor vehicle for its conveyance to the site of the project, said vehicle being the property of the third-party defendant, Transporte Metropolitano, Inc.

"That when the shovel was delivered to said carrier for its transportation on lessee's account, it had been previously examined by Mr. Goss, personally, although he did not perform the inspection of the change of the attachment made by his employees.

"That said shovel was going to be operated by Clotilde Santos Ortiz, an operator working for Goss, although his salary as such operator was going to be paid by Piñero, being henceforth under the latter's orders.

"That the shovel with its attachment was placed in the aforementioned trailer on the platform of the same and while said trailer, hauled by its tow, went along the highway going to the ward San Isidro of Canóvanas to the site of the project, at about 1:45 p.m. of November 2, 1955, the tow tractor of the trailer got stuck and Héctor A. Piñero ordered one of his employees to look for a bulldozer on his property to pull out the haulage of the trailer from the mudhole, the trailer not having undergone any obstruction.

"That when the bulldozer was approaching the place where the trailer was stuck, Héctor A. Piñero ordered Clotilde Santos Ortiz, as operator of the shovel, to raise the boom with its bucket in order to simplify the bulldozer's task of pulling out the trailer's tow tractor from its mudhole.

"That said Clotilde Santos Ortiz was in turn the operator and employee of Goss who performed the change of the attachment on the aforementioned power shovel before it was delivered to Piñero.

"That said Clotilde Santos Ortiz climbed onto the shovel going into its cabin, he started the shovel's engine, raising the boom with its bucket, leaving it thus raised and turning off the engine again, he went out of the cabin and remained standing on a short ladder which the shovel had in the middle of its boom, after having adjusted a cable thereof which had nothing to do with said boom.

"That Piñero, who was a short distance from the power shovel talking with one of his employees, turned around and pulling out a pack of cigarettes from his pocket put one in his mouth while walking towards the trailer. He stood beneath the shovel to light the cigarette and it was then that the boom of the shovel went down with the bucket, the edges of the left teeth of it reaching Piñero on the left side of his body. Piñero fell to the pavement and remained trapped by the bucket until Clotilde Santos Ortiz himself, who had not noticed the accident, when his attention was called to the occurrence of the same and having received orders to the effect by Piñero himself, entered at once into the shovel's cabin and switching on its engine raised the boom and the bucket freeing Piñero from the weight thereof.

"That thus wounded they conducted Piñero to a hospital in Canóvanas, where they gave him first aid and he was later transferred to the Hospital Auxilio Mutuo of Río Piedras, where he died two days later as a consequence of the injuries received in the aforementioned accident."

The trial court arrived at the main conclusion that "it has not been established that the proximate, sole, and efficient cause of the accident was the negligence of defendant Goss, his employees or agents, on the grounds of the following findings of fact:

"That the power shovel, to which we have referred above, is a Northwest make acquired by defendant Goss, in 1942 at an auction of the War Surplus Supply of the United States Navy in Vieques. These power shovels have a lifetime of from 40 to 50 years. That ever since Goss acquired it he has always leased it,

and at the time of the accident it had been manufactured for 17 years. That this machine has two pedals, the right-hand pedal holds the boom and the bucket in the air moving it at will wherever you want, and the left one is to fix the bucket in the air. When in operation the latch or part which holds the bucket in the air does not work, reason why it lasts longer. The latch on this left pedal constitutes a latch to secure the pedal which adjusts the brakes which hold in suspension the shovel's boom with the bucket. This latch had a wear-out of 10% or less, it being possible to have from 20 to 30% wear-out before being dangerous. The lower level of the other part where the latch holds had a wear-out of 1/16th of an inch, and either of the two parts which is 40% worn out can cause the latch to fail. Both parts should be exaggerately worn out not to hold. As long as these parts have a contact of up to ⅛ of an inch, they have enough strength to hold. It is unusual to let the boom and the bucket remain in suspension for a long time, although if the condition is ideal it can remain thus forever. Something abnormal must happen for it to fall. The wear-out of the latch could still hold enough to operate, it was tolerably worn out, and without a foreign agent it was not sufficient to make the shovel fall.

"That on or about November 7, 1955, that is 5 days after the accident occurred, the power shovel not having been yet put into operation after the occurrence thereof, and on the same project mentioned above, at the request of Emilio Piñero (Millín), who said that the latch was worn out and that he was not going to let anybody work with it unless it was welded, Clotilde Santos Ortiz welded the latch, applying a tack to it for the purpose of correcting the alleged wear-out; the welding had to be removed later with a cold chisel because it did not allow the shovel to operate, since the pedal kept getting caught. After the tack or welding was removed, the machine continued operating normally as it did before.

"That after the accident of Héctor A. Piñero, they found on the floor of the machine, near the pedal, a 'T' or hammer shaped slug two feet long more or less by one-inch wide which belonged with the tools of the shovel.

"That any pressure which is exerted on the pedal which pushes it down may release the latch which clamps or secures the brake which holds the boom of the shovel in suspension.

"That five (5) days after the accident occurred, without the above-mentioned shovel having been put to work after the occurrence of the same and in the aforementioned project, several persons having knowledge of heavy equipment, at the request of Emilio Piñero, Héctor A. Piñero's father, examined the shovel's mechanism with regard to its operation and they found that the latch or pin which allowed the bucket to remain in suspension was worn.

"That the boom of the bucket remained in suspension from the place where the shovel was placed on the trailer until the moment when it got stuck, and on its way leaves, residues of branches from the trees, and twigs entered into the mechanism of the brakes while it was carried by the third-party defendant, Transporte Metropolitano, Inc.

"That there are many reasons for the boom of a shovel to fall, among them: too much grease on the latch, foreign matter which prevents it from fitting, the same being in an unadjusted position, that it is sufficiently worn out, because of vibration if the latch is not duly clamped, etc."

Appellants assign in their brief the commission of the following errors:

"*FIRST:* The trial court erred in determining that it had not been established that 'the proximate, sole, and efficient cause of the accident' was the negligence of defendant Goss, his agents or employees, notwithstanding that the following facts had been established:

"1.—That after the employees of defendant-appellee Goss changed the attachment called front-shag or dragline to the aforementioned power shovel, by instructions of said defendant, and with a view to preparing it for the purpose for which it was rented by plaintiffs' predecessor, when the above-mentioned employees delivered said shovel to be transported to the project of said Héctor A. Piñero, it was not examined prior to said delivery by the operators who performed the above-mentioned change, nor was the cabin of the aforementioned shovel, for the purpose of ascertaining that there was no instrument or matter left therein capable of causing an unexpected and untimely detachment of the brake mechanism of the above-mentioned shovel.

"2.—That the day of the accident, and immediately some minutes after the occurrence of the same, upon the operator of said power shovel, Clotilde Santos, the person selected for such task by codefendant-appellee Goss himself, and the mechanic who in turn performed the work of said change of attachment in the shovel in question, making an inspection of its cabin, found on the floor of said cabin a 'T' or hammer shaped slug more or less two feet long by one-inch wide which was one of the tools which were used for said change of attachment, and because the inspection of said cabin was not performed before the shovel was delivered for its conveyance on a trailer of the third-party defendant Transporte Metropolitano, Inc., the tool in question could have fallen off on one of the shovel's pedals, causing the release of the latch holding the brakes thus producing the unexpected descent of the shovel's boom, according to the opinion of the above-mentioned mechanic himself, who stated that according to his judgment, the fall of said tool, and not other cause, was what caused the above-stated accident.

"3.—That five days after the occurrence of the abovementioned accident, and before the power shovel in question returned to work, and on the aforementioned project, as it is stated in the Findings of Fact of the trial court, said power shovel was submitted to an inspection by experts on heavy equipment, at the request of Héctor A. Piñero's father, and not only did they find that the latch or pin of the brakes which allows the bucket to remain in suspension was worn out, but something more important which the aforementioned Findings of Fact do not mention, that is, that when they tried to operate the shovel in question there and then, on different occasions its brakes did not respond in its pin, the power shovel being unable to keep in suspension the bucket thereof, for which reason the experts concluded that the brakes of the shovel were defective at the time of the accident.

"4.—That the experts in question did not find residues of branches or leaves or any other foreign matter in the mechanism of the brakes, and specifically in the latch of said power shovel, and what is even more conclusive about this particular, that the mechanic of the shovel in question himself examined the latch in question immediately after the accident and did not find any

of the residues mentioned above in the mechanism of the brakes of the aforementioned device.

"5.—That the above-mentioned shovel had been exposed to have an accident identical with the one that occurred to Héctor A. Piñero, while working just a few months earlier on a project in Guayanilla, P.R., when its brakes failed to work, the assistant operator of the same having taken the risk of having been reached by said shovel, and it was at that same project where the shovel in question had been working lately, immediately prior to its transfer to Héctor A. Piñero's project.

"6.—That the then operator of said shovel, selected by co-defendant-appellee Goss, at the time when the above-mentioned failure of the brakes in said shovel occurred, informed Goss thereof, who postponed the repair of said brakes to when he had more time, reason for which in the future the operator operated the same leaving the bucket on the ground instead of in suspension, for fear that the brakes should fail causing an unexpected fall of the shovel's boom and bucket.

"*SECOND:* The trial court erred when it concluded that because there are many factors which may cause a defect in the brakes of a power shovel, plaintiffs-appellants failed to establish that the proximate, sole, and efficient cause of the accident was the negligence of said codefendant-appellee, Goss, and all that notwithstanding the fact that the foregoing facts which establish the negligence of the aforementioned owner of the shovel in question were proved.

"*THIRD:* Because although it is true that the different causes mentioned by the trial court in its Findings of Fact may cause a defect in the mechanism of the brakes of a power shovel, it is also true, that in the above-entitled case, it was shown that none of the said causes could have originated said accident, since, considering them in the order specified by the trial court:

"1.—*Too much grease on the latch.*—There was no evidence thereof, and assuming that there had been, said excess of grease would have been due to the negligence of defendant-appellee and/or his employees, who were the ones who greased the shovel prior to its delivery to lessee and before the latter put it into operation.

"2.—*Foreign matter which prevents its fit.*—The mechanic selected by the owner of the shovel, upon examining it immediately after the accident, found that there was no foreign matter in the mechanism of the brakes, such as leaves, and residues, of branches, etc.

"3.—*The shovel being in an unadjusted position.*—There was lack of evidence on this particular, and assuming that there had been, such deficiency would have been due to the negligence of the owner of the shovel for not maintaining the mechanism of the same in the proper manner.

"4.—*Because it is sufficiently worn out.*—If that had been the cause, the negligence causing the accident would have been solely charged upon the owner of the shovel for having leased the same to plaintiffs-appellants' predecessor in a defective and dangerous condition.

"5.—*Due to vibration if the latch is not properly clamped.*—There was no evidence at all on that particular, and on the contrary, the mechanic of the shovel testified that when he left the bucket in suspension, he applied the brakes properly.

"*FOURTH:* The trial court erred by not applying to the present case the rule that the negligence may be inferred in circumstances properly presented in evidence, as it happened in the case at bar as it is revealed by the evidence heard, circumstances which raised the reasonable presumption of the negligence incurred by defendant-appellee, the facts themselves which establish the accident, and which give rise to said circumstances revealing the presence of negligence on the part of the owner of the power shovel in question.

"*FIFTH:* Given the nature of the evidence presented in the action which gives rise to the present appeal, the trial court erred in not applying the rule which states that a plaintiff in an action for damages is not required to establish with all certainty that the proximate, sole, and efficient cause of an accident must be established with all certainty, it sufficing that the evidence, as in the instant case, reveals that of several possible causes established by the evidence, there is one which offers greater grounds to conclude that it is the most probable to support defendant's negligence.

"*SIXTH:* Given the nature of the relations existing between lessor and lessee, between codefendant-appellee, Goss, and plaintiffs' predecessor, Héctor A. Piñero, and according to the evidence submitted, the trial court erred in applying the following principles for the purpose of establishing and appraising the negligence of said lessor:

"A.—That upon every lessor of a thing which constitutes one which involves a mechanical device in its operation, the law imposes the obligation of delivering the same to the lessee with the mechanism in question fitted to operate in accordance with the purpose for which it was leased.

"B.—That every lessor is bound to indemnify for the damages which the thing leased causes to a third party, including the lessee because of a defect of the same of which the lessor had knowledge, or without having knowledge thereof, he could have known about it if he had exercised the proper diligence.

"C.—That every lessee has the right to assume that the thing leased upon receiving it from the lessor is in condition to serve for the purpose for which it was leased, and that its mechanism is free from defects which may risk the security or life of the persons who will be in contact with the same.

"D.—That every lessor of a thing is an insurer of the lessee and of third parties who suffer damages as a consequence of defects in the mechanism of the thing leased, if the lessor had knowledge of said defect or he could have known of the same if he had exercised the proper diligence.

"*SEVENTH:* Because the trial court erred, not precisely in the weighing of the evidence heard at the trial of the case which gives rise to the present appeal, but it did commit a serious error in the weighing of the effect and legal scope of the evidence in question, and specifically insofar as pertinent to the particulars thereof to which the foregoing first three Grounds for Review refer.

"*EIGHTH:* Because notwithstanding the fact that the trial court declared established the intermediate facts which by themselves show that defendant-appellee, Goss and/or his employees, incurred negligence, the majority of those hereinbefore recited being among said facts, the trial court erred upon concluding as a definite fact that the owner of the said shovel did not incur negligence in connection with the above-mentioned accident, for

which reason, this Supreme Court is not bound to hold as correct the above-mentioned definite fact about absence of negligence.

"*NINTH:* Because the trial court erred in adopting the findings of the experts of defendant-appellee, Goss, as to the fact that, despite having acknowledged that the latch of the shovel was worn out, such wear-out being, according to them, of only 10% and it did not exceed 30% was not sufficient to cause the defect in the mechanism of the brakes of the shovel at the time of the accident in question, and all that notwithstanding; (1) the occurrence of the facts by themselves showed the mistake of the experts; (2) because the opinion of the experts are in conflict with the evidence heard; and (3) because this Supreme Court is not bound by the findings of said experts, nor by the probative value which the trial court gave to their testimonies, since the said opinions of the aforementioned experts were not the only evidence submitted on the effect of the wear-out of the above-mentioned latch of the brakes in the occurrence of the accident.

"*TENTH:* The trial court erred, and as a result of dismissing the complaint, of not having imposed costs and attorney's fees to defendants-appellees, Edwin V. Goss and Maryland Casualty Company, for which reason, the parties hereto request this Supreme Court to impose costs and attorney's fees on the former upon reversing the judgment and rendering another granting the complaint."

■ We have carefully analyzed the extensive evidence introduced at the trial, which consists mainly of expert testimony. We considered the real probative value and the most accurate legal effect which should have been attributed to each testimony or piece of evidence, or which it justly deserved, in a search for the most rational, fair and juridical balance which the totality of that evidence represented. As an inescapable conclusion of all that task we decide that the judgment object of the present appeal should be reversed, because the findings of fact to which the trial court arrives herein do not represent in any manner said balance.

The nature of the assignments set forth forces us to per-

form, at least on its essential part, a summary of the oral evidence introduced by the parties.

*CLOTILDE SANTOS ORTIZ*, operator of the machine, testified as witness of the plaintiffs and as witness of the defendants.

In essence he stated that he has been working with heavy equipment for 13 or 14 years, that he can take apart and assemble any shovel without the need of any plan. (Tr. Ev. piece I p. 150.) That on several occasions he had worked with the shovel causing the accident. That he always worked with the employer who rents the same. (Tr. Ev. I p. 150.) That he had worked for nearly two years with that shovel. (Tr. Ev. I p. 152.) That he is acquainted with that shovel ever since 1942 when it was in Vieques. That the cause of the accident was that a rod of about 28 inches had been left inside the cabin of the machine when the system was being replaced to a dragline, and that he thinks that that rod fell off on the pedal of the brakes releasing the latch which held the boom in suspension. (Tr. Ev. I p. 154.) That due to the fact that the trailer which was going to transport the shovel arrived too early it did not give them an opportunity to collect all the parts or tools which were used to repair the machine some of them being left misplaced within the cabin. (Tr. Ev. I p. 155.) That that substitution was made while the shovel was in Goss' possession. (Tr. Ev. I p. 154.) That because of the hurry the shovel was not checked or supervised before it left the repair shop, that "everything remained as it was." That according to his opinion the rod was what caused the accident. (Tr. Ev. I p. 157.) That he always works on that shovel, but it is paid by the person who rents it. (Tr. Ev. I p. 159.) That the latch which held the boom in suspension was worn out, but that he thinks that that was not the cause of the accident. (Tr. Ev. I p. 162.) That what was done to the shovel was a change or substitution of the system, not

repairs. (Tr. Ev. I p. 60.) That those in charge of the transportation arrived after *7:00 a.m.*, more or less, to collect the shovel. (Tr. Ev. IV p. 61.)

That always, during the transportation of a machine of that nature on its passage, branches, almond leaves, and everything that runs into it on its way fall inside the same (Tr. Ev. IV p. 71), but that the day of the accident he did not find leaves, branches or any foreign matter near the pedal of the brake. (Tr. Ev. IV p. 109.) That the substitution or change to the dragline system was made on Goss' account. (Tr. Ev. IV pp. 114 and 116.)

That about five days after the accident several experts went to examine the shovel, that they tampered with it, that they handled the pedal, but they never started the engine, that they did not operate the boom and bucket that they only tampered with the pedal. (Tr. Ev. IV p. 123.) That the experts attributed the accident to the wear-out of the latch which holds the boom in suspension, but that he did not agree with that opinion. (Tr. Ev. IV p. 131.)

As a witness for defendants, Clotilde Santos reiterated almost everything he had testified as witness for plaintiffs. He reiterated that neither John Grazel, nor any other expert put the machine to work while he was there, the day they went to examine it. (Tr. Ev. VI p. 139.) That he did not find in the brakes nor in the latch any leaf or branch which obstructed its performance. (Tr. Ev. VI pp. 129, 130.) That in his presence nobody put the machine to work. (Tr. Ev. VI p. 137.) That he was the one who delivered the shovel to those in charge of its transportation. That before it was delivered, because of the hurry, it could not be checked; that he put it on the trailer and did not handle it anymore. (Tr. Ev. VI p. 184.)

That the latch which holds the boom of the shovel in suspension had never been changed, but that as a general rule

that part is never changed except in extreme cases. That the rod which he indicates as being the cause of the accident is a part of the tools of the shovel, that because of the hurry of that day all the tools were left scattered within the cabin of the machine. (Tr. Ev. VI p. 185.)

Later on he again testifies as witness for plaintiffs apparently for the purpose of attacking the credibility of codefendant Goss' testimony. On that occasion Santos testified that Goss appeared at the scene of the accident that same day of the accident in the afternoon; that he asked him what had happened and he told him that the boom had fallen. *That on that occasion Goss did not test the brakes of the shovel, that he did not test anything that day.* (Tr. Ev. VII p. 386.)

*JOSE BOSCHETTI TORRES*, operator of heavy equipment since 1935, testified that Clotilde Santos had been his assistant on a job in Fajardo. That he has known Goss for eight or nine years. (Tr. Ev. II p. 54.) That some months before he had worked operating the shovel which caused Piñero's death. That the latch of the same was quite worn out. That one day the boom fell and it was going to kill a co-worker. (Tr. Ev. II p. 57.) That that happened when he was working on a project of the Capitol Construction in Guayanilla. That said incident occurred about three months before the system was changed to a dragline to rent it to Piñero. That he reported that situation to codefendant Goss when the shovel was going to be transferred to a project in Bayamón. (Tr. Ev. II p. 59.) That after that incident no reparation was made to that part. That the latch of the shovel was in bad shape. (Tr. Ev. II p. 60.) That what wears out is the fixed part of the shovel which makes contact with the latch, the fixed part. That many times it is welded to fill it. That the movable latch which fits into the fixed part wears out also. (Tr. Ev. II p. 64.) That no other incident occurred because he never again left the bucket in the air, he always

left it on the ground. (Tr. Ev. II p. 65.) That the shovel has two brakes, one to manipulate it and the other to leave it in suspension. (Tr. Ev. II p. 66.) That he is acquainted with that shovel since 1954. That at that time it was thrown on the ground in Ensenada with the center pin broken, and it was there where Goss knocked it down from the Navy. (Tr. Ev. II p. 68.) That he does not believe that the 28-inch rod abandoned in the cabin was the cause of the accident since there was a great distance between the place where it was and the brake for it to fall on the pedal. (Tr. Ev. II p. 74.) He repeats that he reported to codefendant Goss about the defect of the shovel and the latter stated that it would be repaired when there was time. (Tr. Ev. IV p. 261.) That when working he never left it in the air, he always placed it on the ground, and when he was working with it he applied the brake with the foot. That he never removed his foot because it fell. That he never informed anyone on the project about this. That later he went to work with the machine to a project in Cataño. (Tr. Ev. IV p. 267.) That later on he worked extracting gravel with the shovel in the P.R. Aggregates in Carolina and he always placed his foot to prevent it from falling. (Tr. Ev. IV p. 271.) That when the change of the dragline system started, he sprained his waist, was absent because of sickness, and when he returned Clotilde Santos already had his work and he found out that the latter was going to operate it on Piñero's project. That the co-worker in Guayanilla, whom he was going to hit with the shovel, was named Enrique Colón, and he operated another shovel next to him. That while he operated the machine he always placed his foot on the brake and that when he left the cabin he left the bucket on the ground. (Tr. Ev. IV p. 275.) That the project in Guayanilla lasted about nine months. (Tr. Ev. IV p. 281.) That the wear out of the latch was of about three-eighths of an inch. (Tr. Ev. IV p. 287.) That the incident in Guayanilla occurred at the moment when he was going to

drink coffee, he left the bucket above and it fell. (Tr. Ev. IV p. 293.) That he did not report it to his immediate supervisor because since that attachment was not necessary to operate the shovel and to be careful, he did not deem it necessary. (Tr. Ev. IV p. 297.) That he did not report it either to the owner of the project, Capitol Construction, that he did notify it to Goss because he was the one who made the repairs. (Tr. Ev. IV p. 298.)

*JORGE ESCUDERO,* Civil Engineer, specialized in electricity, testified that he knew the deceased as well as he knew codefendant Edwin Goss. (Tr. Ev. IV p. 205.) That after the accident he was called in his expert capacity by Emilio Piñero and Simonpietri, together with Engineer Oscar Valle, to examine the shovel which caused the death to see whether it had any defect and to find out what could have caused the accident. (Tr. Ev. IV p. 205.) That that day he examined the shovel in the company of Engineer Oscar Howe. That that happened at about three days after the death of plaintiffs' predecessor. That that day the shovel was at Piñero's project in the Canóvanas road. (Tr. Ev. V p. 207.) That the brake band was examined and it was found to be in good condition; that that was the reason for not starting the shovel's engine; that the latch which secures the brake was somewhat defective. That for more than fifteen years he has been working with that type of shovel. That he is engaged in the business of excavation and in the business of renting heavy equipment and he also sells power shovels. (Tr. Ev. V p. 208.) That that function of the latch is to keep the boom in suspension. That that latch is what holds the brake. (Tr. Ev. IV p. 209.) That when he examined the latch he found that the same had a certain wear-out of about one-eighth to three-sixteenth of an inch. That the latch wears out because of friction. (Tr. Ev. IV p. 212.) That that part is changeable; that from the inspection performed he would say that that

part needed repair. That in the way in which the accident occurred he cannot see any other cause other than the latch got loose as a result of the wear-out caused by friction. (Tr. Ev. IV p. 213.) That he would never run the risk of standing beneath the bucket of a shovel of that nature. (Tr. Ev. IV pp. 229 and 230.) That he recommended Millín Piñero not to operate that machine without repairing the latch. (Tr. Ev. IV p. 241.) That when he rents one of his machines he inspects it and then he sends one of his mechanics to make a complete checkup and he delivers the machine in the best possible condition. *That in the case of that latch a simple inspection would have been sufficient to determine the defect.* (Tr. Ev. IV p. 249.)

That no dirt nor branches nor pieces of wood were found within the cabin of the machine. (Tr. Ev. IV p. 248.) He set forth that he thinks that the boom collapsed because the latch slipped because of the wear-out it had. He repeats again that it would be risky to stand underneath the bucket of the shovel. (Tr. Ev. IV p. 252.)

*JOHN GRAZEL* testified that in 1933 he studied heavy equipment and since that time he has been working as operator and mechanic of that type of equipment. That at the present time he is engaged in the renting of heavy equipment, owning two cranes of different sizes. (Tr. Ev. II p. 15.) That he in person in his workshop supervises all the mechanical conditions of his equipment for the purpose of keeping it in the best condition, especially when the same is going to be rented to third parties. (Tr. Ev. III p. 17.) That he was called by René Silva Vincenty, who worked at that time with Millín Piñero in order to determine in his expert capacity, the possible cause of the accident that occurred to Héctor A. Piñero. (Tr. Ev. III p. 23.) That he went to examine the machine which was in Río Grande near the place where it was going to be used for the extraction of sand. (Tr. Ev. III

p. 24.) That Clotilde Santos, the operator, was there and he asked him. That he asked him to switch on the engine to test the brakes and to see how they worked. That he raised the boom and the bucket several times, that he kept the boom above and when the latch was placed the brake held the boom in suspension, but that when he performed a slight movement on the floor of the cabin it automatically collapsed because the latch got loose. (Tr. Ev. III pp. 25 and 26.) That this happened three or four times. (Tr. Ev. III p. 26.) That he thinks that the fall of the boom was due to the fact that the latch was worn out and did not have a perfect fit. That he examined that latch and found out it was worn out. (Tr. Ev. III p. 27.) That this has to do with two parts which have to be square in order to have a perfect fit and in this case both pieces of metal were worn out. (Tr. Ev. III p. 33.) That after the inspection he recommended Piñero to order Goss to repair that part. That it could be repaired by means of a welding which covered the part worn out. (Tr. Ev. III p. 41.) That the calculated lifetime of the latch shall depend on the use given to the machine, that it may last for a few years and it may last up to 20. (Tr. Ev. III p. 84.) That he examined that machine the first Monday after the accident at about 9:30 a.m. (Tr. Ev. III p. 106.) That codefendant Goss arrived about two hours later. (Tr. Ev. III p. 109.) That he performed the test of raising and lowering the boom about three or four times. (Tr. Ev. III p. 111.) That about *30% of the latch was worn out and also of the pin.* (Tr. Ev. II p. 3.) That a sudden jump of the machine may cause the latch to get loose. (Tr. Ev. II p. 4.) That there are two reasons which may cause the boom to fall, because the latch does not fit or because the pin brakes. (Tr. Ev. II p. 11.) But that only once in his lifetime he has seen that pin break. And in this case it was not broken. (Tr. Ev. II p. 12.) That any foreign matter as for example branches, leaves, peels, seeds, almonds, etc.

could interrupt the fit of the latch (Tr. Ev. II p. 33) but that he examined the cabin and did not find any foreign matter which would obstruct the fit. That the latch was worn out, had too much movement and a slight commotion would have caused the loosening of the fit. (Tr. Ev. II p. 39.) That in his inspection he found that the pin which held the latch was not broken. (Tr. Ev. II p. 42.) That when those machines are in operation one should not stand under the boom of the same but that everybody does it. (Tr. Ev. II p. 42.)

*CARLOS JOSE BENITEZ ANCA*, who in short stated he was the president of third-party defendant Transporte Metropolitano, Inc. (Tr. Ev. VII p. 79.) That that corporation is engaged in the transportation of heavy equipment and was organized in 1954. (Tr. Ev. VII p. 80.) That once he was an employee of Concrete Mix, Inc., enterprise where the deceased had many economic interests. (Tr. Ev. VII p. 81.) That when Piñero ordered the transportation of the shovel he did not have any trailer available for which reason he had to borrow one from Rexach enterprise. (Tr. Ev. VII p. 87.) That that trailer had a capacity of about 70 to 80 tons. (Tr. Ev. VII p. 88.) That after the accident the shovel in question was subject to an inspection by experts; that he was present at that inspection. That the latch was tested about ten or twelve times and when they tried to leave the machine above in suspension the latch did not fit well. That of those ten or twelve times the latch did not fit well on two or three occasions, that when it did not fit well the latter got loose and the bucket fell. That he had the opportunity to observe the latch and he thought it was worn out. (Tr. Ev. VII p. 124.) That both parts were worn out. (Tr. Ev. VII p. 126.) That during the inspection several persons were present including the operator Clotilde Santos Ortiz. That the inspection was made from 10:00 to 11:00 a.m. (Tr. Ev. VII p. 131.) He says that he observed that there were leaves in the cabin but that

these could not be large residues which could interrupt the function of the latch since the pedal covers it. (Tr. Ev. VII p. 132.) That between the pedal and the latch there is only one inch and there is no room for any large residues. That from his inspection he determined that there were no large residues. That the latch had grease and dust but that he thinks that this could not affect it. (Tr. Ev. VII p. 133.) That the day of the inspection of the shovel, John Grazel, Millín Piñero, and Clotilde Santos were present among other persons. That once the project was finished his company transported the shovel to defendant Goss' house. (Tr. Ev. VII p. 136.) That he went to the place where the machine was going to undergo inspection at about 10:30 a.m. That Clotilde Santos was ordered to start the engine. That Clotilde Santos started the engine and alighted from the same and kept on walking. That he entered the cabin and placed himself as if he were going to work. That he raised and lowered the bucket. That he repeated this operation ten or twelve times. That on two or three occasions he had difficulty for every time he put his foot on the pedal it bounced back. That he had to move his foot sideways so that the latch could fit. (Tr. Ev. VII p. 157.) That John Grazel worked that day with the machine. (Tr. Ev. VII p. 159.) That he saw when Grazel operated the machine. That he moved the boom and the dipper stick. (Tr. Ev. VII p. 162.) That when he alighted from the machine he had to secure the pedal with a chain. (Tr. Ev. VII p. 167.) That was in essence plaintiffs' material evidence.

The first witness for the defendants, *MICHAEL CHACKER*, an Engineer graduate of Rutgers University and of the United States Navy Reserve, testified that his specialty is Marine Engineering; that within that specialty he has had the opportunity of handling power shovels. That he had the opportunity to examine the mechanism of a shovel on the property of codefendant Goss. (Tr. Ev. VI p. 222.) That a part was handed to him, that he cut a piece of the

same, so that there could be a cross section of the metal, so that it could be possible to see the amount of wear-out in the same before it was welded. (Tr. Ev. VI p. 226.) That he polished the surface, *that that piece was later given an acid bath to see where the new metal has been joined with the original metal.* (Tr. Ev. VI p. 231.) That it is not proper to weld a part of that nature. That from his *visual examination* he could notice and determined, in his opinion, that the part was only 10% worn out. (Tr. Ev. VI p. 233.) That in his opinion a wearing of that intensity is not sufficient to cause the operation of a machine of that nature to become dangerous. That the machinery of the equipments is designed so that it can resist from 20 to 30% of wearing before it becomes dangerous. (Tr. Ev. VI p. 234.) That other reasons in addition to the wearing of the latch can cause an accident of that nature such as the failure of a pin, the fracture of any of the molded parts, that a spring breaks, or because a foreign matter enters into the mechanism of the shovel. That this foreign matter could be a stone, wood or any other material which might fall between both parts. (Tr. Ev. VI p. 235.) That those machines have a very long estimated lifetime, that at present there are machines operating in the island which have from 40 to 50 years. That the latch goes ¼ of an inch within the fixed part, that is ¼ of an inch of the latch rests within the other part. (Tr. Ev. VI p. 252.) That in the fixed part he could measure the wearing with a protractor and that it was about 10% worn out, but in the latch he did it by observing the corners. That he measured the height with a depth micrometer. (Tr. Ev. VI p. 258.) *That he could not observe both parts together operating in the machine.* (Tr. Ev. VI p. 275.) *That he has never operated a shovel. That he never saw the shovel in question in operation.* That when he saw it for the first time it was disassembled at the patio of the house of codefendant Goss. That the same was going to be re-

paired. (Tr. Ev. VI p. 299.) That he is not testifying about the brakes efficiency, that he cannot testify about that since he would have to assemble the part first. (Tr. Ev. VI p. 311.) That when he testified about the tolerance which those parts endure he was referring to the general practice of Engineering, he was not referring to the parts of that Northwestern machine. That he was referring to machinery or equipment of that type in general. (Tr. Ev. VI p. 313.) Afterwards he stated that the wearing of that part he examined was not sufficient for it to come off on that account only. (Tr. Ev. VI p. 329.) That he would never stand under any shovel because it is dangerous; that that would not be a security measure. (Tr. Ev. VI p. 335.)

The second expert witness for the defendants, *NATHA-NIEL WARMAN*, testified that he had studied preengineering in Potomac State College in Virginia finishing his bachelor's degree in science in the Naval Academy of Annapolis in 1931, that he also studied a postgraduate course in engineering in the California Institute of Technology. (Tr. Ev. VI p. 352.) That under normal conditions that part in particular (the latch) should have an estimated lifetime of 10 years or more. (Tr. Ev. VI p. 358.) That a latch may endure a wearing of from 25 to 40% and still render good service. (Tr. Ev. VI p. 361.) That had the latch been subject to a higher tension during the transportation due to the vibration and the position of the boom it would have appeared that the former was in good condition. (Tr. Ev. VI p. 367.) That other reasons could be the cause of the accident, such as the improper application of the brake, excess of grease, etc. (Tr. Ev. VI p. 368.) That any wearing cuts down the margin of security, but that there is a margin of wearing which is within the security. (Tr. Ev. VI p. 380.) *That he was not able to see the old part in question because it had been replaced.* (Tr. Ev. VII p. 12.) *That when he examined the machine that part*

*had already been replaced. That one of the parts which fit had
been cut to be examined.* (Tr. Ev. VII p. 13.) That that
examination was performed one month prior to his testimony
in court, that is during 1960. That never before had he seen
that machine. (Tr. Ev. VII p. 14.) *That he did not examine
that latch, that he has no knowledge at all of the wearing of
that latch, but relying on his experience he concludes that if
it held during the transportation it was because it was in
good condition.* (Tr. Ev. VII p. 21.) *That he thinks that it
could be possible that the operator may have placed the latch
in a wrong way.* (Tr. Ev. VII p. 30.)

The third witness, *THOMAS LUFF*, mechanic of heavy
equipment on the Project of Capitol Construction in Guaya-
nilla during the time when the shovel in question was being
used there, testified that during the time that that shovel was
being used there it did not have any defect, except for one
day when dirt went into the oil lines. (Tr. Ev. VII p. 46.)
That if there had been any difficulty with that shovel he
would have been the first to know about it since he worked in
the field on that occasion. That the shovel never fell; that he
never heard of it having fallen. That that shovel worked there
for about three months; that Boschetti worked on the same
from the beginning until they took it away. (Tr. Ev. VII
p. 48.) That Boschetti never made any observation to him
with regard to defects in the brake, latch or the bucket of the
shovel. That he is absolutely sure that Boschetti did not work
there during 8 months. (Tr. Ev. VII p. 51.) That he was
the person in charge of repairing the machine and it was
never reported that the brake of the same had a defect. (Tr.
Ev. VII p. 51.) That during the time it was there the boom
never fell. That if any accident had occurred there he would
have known about it. (Tr. Ev. VII p. 63.) At the end he
stated that Boschetti was a very serious operator and was
efficient in his work. (Tr. Ev. VII p. 72.)

*RAMON GONZALEZ NIEVES*, fourth witness for defendants, testified that he worked with Boschetti in the refinery between Bayamón and Cataño, that during all that project there was no incident in connection with the falling of the boom of the shovel. (Tr. Ev. VII pp. 182 and 183.) That a person went to his house asking him to come to the trial to testify that the shovel got loose. (Tr. Ev. VII p. 188.)

The last testimony of defendants was that of codefendant Goss himself, who among other things, testified that when he heard of the accident he went forty minutes after the occurrence to the scene of the accident, that he examined the cabin of the shovel; that it was wet, that the latch was full of leaves; that at that moment he tested the brake to determine whether it got loose and it did not get loose. (Tr. Ev. VII p. 270.) That he, personally made an inspection of the shovel before delivering it to Piñero; that he wanted to be sure that the brake and the clutch were in good condition the reason why he himself tested them. (Tr. Ev. VII p. 266.) That he adjusted the brake; that he found that it worked perfectly; *that he did that on the morning of that same day;* and that Piñero received the shovel at about 8:00 a.m. and he had made the inspection at about 7:00 a.m.

I

Our Civil Code provides that: "Those who in fulfilling their obligations are guilty of fraud, *negligence*, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby." Section 1054; 31 L.P.R.A. § 3018. (Italics ours.)

The same legal text adds further that: "The fault or negligence of the debtor consists of the omission of the steps which may be required by the character of the obligation, and which may pertain to the circumstances of the persons,

time, and place." The same provision continues stating that "should the obligation not state what conduct is to be observed in its fulfilment, that observed by a good father of a family shall be required." Section 1057; 31 L.P.R.A. § 3021.

We have stated that these legal provisions are applicable to those judicial actions where there exists a prior contract; *Arroyo v. Caldas,* 68 P.R.R. 639 (1948), reason why they have been applied to actions for damages on the ground of breach or nonfulfillment of a contract. *Camacho v. Catholic Church,* 72 P.R.R. 332 (1951), *Maldonado et al. v. Municipality of Ponce,* 39 P.R.R. 226 (1929). The mere fact that a wrongful act takes place as a consequence of breach of contract does not alter the nature of the action. *Rosario Quiñones v. Municipality of Ponce,* 92 P.R.R. 571, 579 (1965).[1]

In any event the mere labeling of damages given to the present action, finally, would not have any effect on the final result of the case, since under one standard or the other the evidence introduced before the trial court was sufficient to grant the complaint.[2]

---

[1] *Cf. Torres v. Fernández,* 56 P.R.R. 459 (1940) and *Oller v. Purcell Bauzá,* 92 P.R.R. 143 (1965).

[2] Manresa in his VIII-1 *Comentarios al Código Civil Español* 146 *et seq.* has stated that:

"If we assume the unitary sense which we have given to the notion of fault, as something which must concur so that liability can be established, we shall observe the lack of grounds to grant so much importance, as we often do, to classifying the fault into contractual and extra contractual (1), in essence one and the same, without denying that they present, when entered in action with the respective situations of one kind and the other, certain particularities, and that with regard to the so-called 'aquilian' the standards of article 1.902 *et seq.,* must be observed in the first place, as pointed out by article 1.903, already commented on. But nothing herein is an obstacle to prevent the division, beyond what is necessary, of that entity, fault which must be always combined with the idea of liability and the action or determining omission of the nonfulfillment, to reach the result, that is the obligation to indemnify; and in which function it shall always operate so that said obligation may be estimated."

■ . In cases of this nature plaintiffs assume the responsibility of establishing before the trial court the following essential elements of their cause of action: (1) that the machinery or equipment causing the damage had certain mechanical defects, (2) that those defects were the proximate and sole cause of the accident, and (3) that defendant knew, or in the exercise of due care he should have known, those imperfections; in other words that a reasonable inspection of the machinery should have sufficed to discover the same. Alexander v. Cheek, 241 S.W.2d 950 (1951).

■ If under our laws it is the duty of the lessor to deliver the thing which is the object of the contract in such a condition as to permit the lessee to make use of the thing for the purpose to which it was destined, § 1444 Civil Code of 1930; 31 L.P.R.A. § 4051, Cole v. Escambrón Development Co., 73 P.R.R. 477 (1952), the lessor of an equipment or machinery as the one in question herein, should not wait for lessee to examine it; therefore the latter may rely on the confidence that the other contracting party has fulfilled its obligation delivering the machinery in a condition fit to be used.

The minuteness of the inspection shall depend, in any event, on the type of machinery or equipment which is being offered for lease. Thus, if it was one that although defective could only cause light damages, its lessor is not bound to perform such an intensive inspection as the one which should be performed by the one engaged in renting equipment or machinery which is inherently dangerous, or which acquires that condition once it is put into operation. Restatement of the Law of Torts, § 408.

■ It has been decided that, notwithstanding the fact that a crane, a power shovel or any other heavy equipment cannot be classified as inherently dangerous articles, they acquire that condition once they are put into operation, Geffrey v. Langston Constr. Co., 58 So.2d 698 (1952),

*Roberts* v. *Geo. M. Brewster & Sons*, 80 A.2d 638 (1951), 3A Personal Injury—Actions·Defenses·Damages 352, § 105.

█ It has also been stated, that when, as in this case, the lessor has acquired the equipment or machinery from a former purchaser, that is to say, he has bought it secondhand, the obligation of inspection imposed on him by law is intensified, a more severe examination being required in those cases. He is bound also to submit the machinery to an inspection on regular intervals, especially when the same is inherently dangerous. Restatement of the Law of Torts, *supra.*

In *De Maria* v. *Renee Operating Corp.*, 122 N.Y.S.2d 236 (1953) the court of appeals faced a situation of facts similar to that of the instant case. There the evidence introduced established that the lessor had made a visual inspection of the machinery and of several of its disassembled parts prior to its delivery to lessee. The court of appeals concluded that that mere visual test was not sufficient to free the owner of the equipment from liability. It was pointed out that he should have performed a reasonable inspection to uncover not only the patent defects but also the latent. See also: Anno: *Personal Injuries Caused by Defective Bailed Equipment or Machinery*, 3 N.C.C.A. 223 (3rd series); Anno: *Liabilty for Injury or Damage Caused by Negligent Operation of Crane Derrick or the Like*, 81 A.L.R.2d 473; Anno: *Liability of Bailor for Personal Injuries or Death Due to Defects in Subject of Bailment*, 131 A.L.R. 845; Anno: *Liability of Bailor of Automotive Vehicle or Machine for Personal Injury or Death Due to Defects Therein*, 46 A.L.R.2d 408; *Scharf* v. *Gardner Cartage Co.*, 113 N.E.2d 717 (1953); *La Rocca* v. *Farrington*, 93 N.E.2d 829 (1950), *Asplund* v. *Driskell*, 37 Cal. Rptr. 652 (1964).[3]

---

[3] The Regulation of Industrial Safety for the Cutting and Transportation of Sugarcane, Bulletin No. 3, 5th ed. (1964) at page 15, states that:

"(k) Every crane shall be inspected prior to the beginning of the grinding season, and periodically during the process of operation, to see

The expert testimony introduced, for the purpose of establishing or denying the existence of the mechanical imperfection, was unanimous in accepting that the latch which hooked the brake to keep the boom of the shovel in suspension was worn out. Where they actually disagreed was as to the percent or amount of the existing wearing. There was no agreement either, as to whether or not, even accepting the existence of the wearing, that part could hold with reasonable security the boom of the shovel in suspension. The trial court rejecting the most reliable and best qualified evidence, believed in its entirety the evidence submitted by defendants tending to show that the wearing found in the latch was not sufficient reason or cause for the boom of the shovel to come off.

■ Consistently we have held that no court is bound to follow blindly the opinion, judgment, finding or determination of an expert or physician, especially when it is in conflict with the testimonies of other experts, and that every court is completely free to adopt its own judgment in the weighing and evaluation of expert testimony, and even to reject the same although it turns out to be technically correct. *Concepción Guzmán v. Water Resources Authority*, 92 P.R.R. 473, 480 (1965); *Pereira v. Commonwealth*, 91 P.R.R. 728, 731 (1965); *People v. Sánchez*, 79 P.R.R. 110, 114 (1956); *Commonwealth v. Bravo*, 79 P.R.R. 732, 739 (1956).

The experts presented by defendants did not have enough contact with the part object of the inspection so as to render a truly grounded and credible opinion about the physical con-

whether the structure, cables, sheaves, and tackle blocks of the same are in good condition, and to see whether the winch is operating correctly. *As soon as it is noted that a part or a device is damaged or defective, the operation of the crane must be stopped and notice thereof should be served on the field superintendent or the person in charge of the work so that the latter shall order the necessary repairs.* The mechanisms shall be kept in good condition." (Italics ours.)

dition of the same. On the other hand the experts for plaintiffs had much more opportunity of performing a better inspection.

One of the experts for defendants never had the opportunity to inspect the part. He testified that his testimony was based on his general knowledge of engineering. He set up his theory that if that part held the boom, slightly suspended, during the course of the trip, that was an indication that the part was in good condition because otherwise it would not have held. He could never observe the physical condition of the part, he could not see how worn out it was, neither could he see it functioning, that is, operating.

The other expert presented by defendants did not have the opportunity either to examine the part in its original state. When he examined it, its physical condition had already been altered. The worn-out part had been covered or filled with a welding. For that reason he had to subject that part to an acid bath, in order to distinguish the original metal from the added metal. Under these conditions he observed the part and determined the amount of wearing. Neither did he have the opportunity to observe the operation of the total mechanism of the shovel, in other words, he could not see, in particular, the part operating. His inspection was made *five years* after the accident when the machine had been repaired and that part had been replaced.

On the contrary the evidence presented by plaintiffs tended to show that three days after the accident their experts inspected the shovel completely and that they examined in particular the brake band; that they checked the latch and the fixed part where the same fits; that both were worn out; that they started the engine of the shovel; that they raised and lowered several times the boom of the same; that they put the mechanism of the latch into operation several times and when they tried to keep the boom up above it fell. The experts gathered there concluded that that worn-out part

was what caused the accident for which reason it had to be replaced.

This evidence was corroborated by the testimony of Boschetti who stated that, on one occasion, while he was operating that power shovel and when he had to leave the boom in suspension to go to drink coffee, the boom fell and it nearly injured one of his co-workers.

As we have already stated, the condition under which the experts for plaintiffs inspected the part object of the investigation were much more adequate for a more accurate conclusion as to the physical condition of the latch, for which reason it should have deserved more weight and credibility than that of defendants.[4] *Concepción* v. *Water Resources Authority, supra;* Anno: *Proof of Economic, Scientific and Technical Facts—Expert Witnesses. Some Practical Problems,* 23 F.R.D. 467.

As to the other aspect of the case, that is to say, insofar as the obligation of defendants to perform an inspection is concerned, the trial court concluded, relying on codefendant Goss' own testimony, that the latter had complied with his obligation, for before delivering the shovel in question to the carrier, he had inspected the brake system of the same.

An examination of all the oral evidence tends to show that the testimony of codefendant Goss should not have deserved complete credit. In the first place, the evidence for the prosecution and for the defense established that the deceased was in a hurry to use that mechanism, that for that reason the

---

[4] It is true that witness Clotilde Santos stated that at that moment, when they went to examine the machine, the engine of the same was not started, nor was the boom raised. However, two witnesses for plaintiffs testified otherwise. Besides, it is more logical that the inspection was made starting the engine and raising its boom for it was the most suitable and practical form of finding out the possible cause of the accident. That is, if they wanted to know why the boom fell the most logical thing to do was to raise and to lower it several times in order to see whether what happened in the accident occurred again.

carrier's employees arrived quite early to pick it up; *that they arrived after 7:00 a.m.;* that Clotilde Santos was the person who delivered said shovel to the employees of third-party defendant, that because of the hurry nothing was collected and all the tools were left within the cabin of the machine.

Codefendant Goss testified that he made his inspection at about 7:00 a.m. and that the machine was delivered at about 8:00 a.m. In view of these statements it is proper to ask ourselves, if Goss was there when they went to pick up the machine, why did Clotilde Santos have to deliver it? Why did not Goss do it himself? His testimony deserved very little credit when his own witness contradicted his statements. Goss testified that after he knew about the occurrence of the accident he went to the place where it happened, that at that moment he entered the cabin of the machine and tested the brakes and that they were in good condition for they did not get loose. However, the final testimony of Clotilde Santos tended to establish that, although codefendant Goss was that day at the scene of the accident, he had not examined anything there.

We believe that the real attitude of codefendant Goss arises from the statements of witness Boschetti who stated that upon telling Goss about the fact that there was a defect in the brake system of his shovel, the latter told him that it would be repaired when there was time. If that had been his previous attitude, from where does that extreme diligence of inspecting the machine in the early hours of the morning and some minutes before it was delivered come from now?

Besides, the time elapsed between the alleged inspection and the delivery was so short and the hurry was so great, that, even parting from the assumption that the same was performed, its severity or minuteness was not sufficient to relieve him from liability. *De Maria* v. *Renee Operating Corp., supra.* Especially when we are concerned with a

machine having thirty years of use and acquired at an auction. Restatement of the Law of Torts, *supra.*

The testimony of Engineer Escudero, expert witness for plaintiffs, was clear in stating that an inspection of the brake system of the machine would have been sufficient to discover the wearing of the latch, for which reason in such situation we must charge codefendant Goss with having knowledge of that defect. *Alexander* v. *Cheek, supra.*

The trial court in its findings of fact sets forth that the expert testimony had established that other factors could have been the cause of the accident.

■ Despite the fact that the evidence presented by plaintiffs eliminated the possibility that several of the factors indicated had been the cause of the accident, we should reiterate the position of this Court in the sense that the probative responsibility of a plaintiff does not reach so far. In *Murcelo* v. *H. I. Hettinger & Co.*, 92 P.R.R. 398, 413 (1965) we stated:

"In this type of action plaintiffs, after presenting evidence in the light of which a reasonable person may be convinced that the wrongful act is due to defendant's fault or omission, *are not bound to eliminate or exclude every other possible cause of the occurrence from which the required liability is derived.* Even in the penal field, when The People only offers circumstantial evidence of guilt, such evidence need not be inconsistent with any reasonable hypothesis of innocence. *People* v. *Bonilla,* 78 P.R.R. 144 (1955)." (Italics ours.)

Obviously, plaintiffs' evidence established said codefendant's liability with respect to the cause of the accident and the damages caused as a result thereof.

## II

Lets turn now to the determination of the damages claimed.

In paragraphs 4 and 7 of the complaint, concerning this point, it was alleged:

"4.—That at the moment of his death Héctor A. Piñero was 29 years old, he was a Civil Engineer and Contractor, he was in charge, on his own account, of the projects of the highway Loíza-Bypass and the Public Works Center of the Government of the Capital of Puerto Rico, projects which he had acquired through bids and in competition with the firms of more prominent contractors of the Commonwealth of Puerto Rico, for the value of more than two million dollars ($2,000,000).

"          .     .     .     .     .     .     .

"7.—That as a consequence of Héctor A. Piñero's death, plaintiffs ceased to receive the support, the company and the protection which he provided them, and because of the nature of the physical damage which his death caused them and the tragic manner in which the same occurred, plaintiffs have suffered a deep pain and mental anguish with the loss of sleep, weight, and appetite, and have endured a long period of nervousness, which damages are reasonably estimated in the sum of $100,000."

Subsequently, at plaintiffs' proposal, the trial court allowed an amendment to the complaint to increase the claim to $200,000. The amendment was granted on the second day of the trial, which was on March 1, 1960, notwithstanding defendants' objection on the grounds that "they had the right to reinvestigate that other $100,000." (Tr. Ev. piece II, p. 3.) The trial started on December 1, 1959 and concluded on August 11, 1960. As a whole there were 14 days of trial between those dates.

Oral and documentary evidence was admitted with respect to the competence, experience, reputation, and professional relations of the young engineer Héctor A. Piñero, his personal condition, and his probable success in his future enterprises. The first consisted of the testimonies of engineer Manuel Font, Executive Secretary of the College of Engineers, Architects, and Surveyors, of the contractor Javier Zequeira

Blanco, and of Esteban A. Bird, then Executive Vice-President of the Banco Crédito y Ahorro Ponceño.

During the former's testimony, the following was stipulated: "That Piñero was born on March 3, 1926; that he received his degree of civil engineer from the College of Agriculture and Mechanical Arts on May 26, 1946; at the time of his death on November 4, 1955 he was married to coplaintiff Georgina Prieto and had four children from that marriage who were the four minor coplaintiffs, he was an engineer of acknowledged reputation as such in his community, and he was treasurer of the above-mentioned College of Engineers, Architects and Surveyors."

The urbanist and contractor Zequeira Blanco, testified at great length on Piñero's professional work, with whom, for several years, he carried out in partnership the construction or repair of important public works, with a value of nearly four million dollars, wherein they received 9.5% of benefit, such as the San José Housing Project, a part of the 65 de Infantería Highway, a landing field in Roosevelt Roads, housing project in Canóvanas and some part of the international airport. He also testified about a mixed concrete business which they had, and that for them, with the exception of one, all those enterprises had good results, Piñero receiving 50% of the benefits. About the personal qualifications of the deceased Piñero he testified:

"He had a natural gift of being an indefatigable worker and of unlimited ambitions; and his relations with other persons; a great personal attraction which made me see in him a person who was bound to have great success in life." (Tr. Ev. piece V, p. 3, hearing of July 27, 1960.)

About the last projects in which Piñero worked alone and on his own account, this witness testified:

"Q. Tell me, do you know what important projects Piñero had during that lapse of time between the date when the last work of the corporation was finished and the death of Piñero?

A. He had two projects. He was awarded the contract in a public works bidding.

Q. Of Highways?

A. Municipal Public Works. All that that is across from the crematory, and a piece of road, and the Canóvanas bypass.

Q. That was all he had?

A. I think he had two or three things more. He had two or three aqueducts, sewerages of some pieces of land with some persons.

Q. Of course, that work of public works, was it an expensive work? Did you go to that bidding?

A. No, sir. I was not in Puerto Rico.

Q. Do you know what the total amount was?

A. It was over a million dollars.

Q. Nearly half of the total amount of the airport works?

A. Almost the same.

Q. Did you finance that, or back it?

A. No, sir.

Q. However, he was awarded the contract?

A. He had already the property and equipment, and the bank and insurance companies had seen him working, and they granted him all the facilities." (Tr. Ev. piece V, pp. 26 and 27, hearing of June 27, 1960.)

Bird testified about the credit relations maintained for several years between his bank and engineer Piñero. It started with the financing of half a million dollars for the construction of the landing fields of the International Airport in which, according to him they had "a great experience . . . great success in the development of the project . . . and they liquidated all the bank credits." (Tr. Ev. piece V, p. 43.) He also testified about several activities of Piñero financed by his bank, activities which were developing ". . . very satisfactorily until Piñero's death, . . ." among them the development of the land of the old Las Monjas racetrack of Hato Rey, for which the bank loaned the sum of $2,000,000 to Piñero and Andrés Reyes. Bird stated that Piñero's death disturbed the development of his businesses and projects, that other contractors and engineers had to take care of them.

When questioned by Mr. Ochoteco to the effect of what was Piñero's reputation in his community as enterpriser and engineer, he answered:

"The highest reputation. Our bank had the highest possible opinion of his integrity and capacity, and the undersigned [sic] also had it."—P. 49 Id.

Plaintiffs' exhibits 12 and 13 refer to the construction by Piñero of a public works municipal center for the value of $1,154,890, and to the purchase, development, and sale of urbanized lots on the grounds of the old Las Monjas racetrack in Hato Rey, for which, in a letter of May 27, 1955, months before his death, the Banco Crédito y Ahorro Ponceño, granted the loan of $2,000,000 to which witness Bird referred.

This letter, signed by Jorge Bermúdez and addressed to Ernesto Reyes and Héctor Piñero, says in its last paragraph:

"Since these conditions are the same under which we organized this transaction, and they were submitted by the above-mentioned letter of E. A. Bird to Ángel A. Sanz, we expect that they shall have your approval and that of Las Monjas Racing Corp., insofar as the latter is concerned, and that this transaction shall be signed and that it will be certainly accomplished, and that the same shall be the beginning of future and greater transactions of mutual benefits, which shall strengthen once more the relations which bind us."

The 19th and 21st findings of fact of the trial court are as follows:

"19. That Héctor A. Piñero, who was born on March 3, 1926, being therefore, at the date of his death, 29 years old, received his degree in civil engineering from the Engineering Faculty of the University of Puerto Rico, and was a member of the College of Engineers of Puerto Rico, that because of his professional enterprises he enjoyed an excellent reputation as such civil engineer, having performed important projects in the branch of engineering, awarded to him through public bids, for the Government of the Commonwealth of Puerto Rico, as well as for the Government of the Capital, and that at the time of his death he

was developing several of the above-mentioned projects, as well as private projects where he had financial interests. That despite the comparatively short time he had been exercising his profession, he had achieved financial success and enjoyed solid bank credit, as well as with the companies engaged in the posting of bonds to contractors in connection with public works.

".        .        .       . .        .        .        .        .

"21. That the only universal heirs of Héctor A. Piñero are plaintiffs, his children Georgina María, Celia María, Héctor, and José Ramón Piñero Prieto, approximately 7, 6, 5, and 4 years old, respectively, at the date of their father's death, all begotten during his marriage with coplaintiff Mrs. Georgina Prieto, who was, accordingly his surviving widow at the date of the filing of the complaint, having married for the second time, plaintiffs' predecessor at the date of his death having established his home in the company of them all."

Taking into consideration all the factors for granting damages present in this case, among them engineer Piñero's age, that of his 4 children, the subsequent marriage of coplaintiff Georgina Prieto, and the other elements of loss of company, sufferings, and personal anguish which naturally and usually follow the death of the husband and father, we consider the amount of $200,000 as the total and reasonable amount for the damages they suffered. See *Widow of Fornaris* v. *American Surety Co. of N.Y.*, 93 P.R.R. 28 (1966) and *Rodríguez* v. *Ponce Cement Corp.*, ante, p. 196.

■ Although the accident which gave rise to this litigation occurred prior to the date on which Act No. 28 of June 9, 1956 went into effect, act which amended § 1802 of our Civil Code, after considering the provisions of § 1056 of the same Code in agreement with its §§ 1042 and 1057, and after considering also what was stated in *Ramos* v. *Carlo*, 85 P.R.R. 337 (1962), especially at pages 351, 353, which doctrine we expressly adopt now, and, further, after considering the learned concurrent opinion of the then Justice Ortiz, in *Irizarry* v. *People*, 75 P.R.R. 740 (1954), in the light of the

attendant circumstances of persons, time, and place we conclude: that engineer Piñero was guilty of contributory negligence, which we fix at 30% exercising the mitigating power granted to us by said § 1056. Therefore, the stated amount for damages should be finally reduced to $140,000, to be paid as follows: $17,500 for coplaintiff Georgina Prieto and the remaining $122,500, in equal parts, for minor coplaintiffs Georgina María, Celia María, Héctor, and José Ramón Piñero Prieto.

On the foregoing, our judgment in *Kobler* v. *Escambrón Development Corp.*, 85 P.R.R. 715 (1962) is hereby reversed.

The judgment appealed from will be reversed and the complaint will be sustained ordering codefendant Edwin V. Goss to pay to plaintiffs the amount of $140,000 as stated above, and, codefendant Maryland Casualty Company, will be ordered to satisfy solidarily said penalty up to the sum of $50,000, maximum limit of liability under its policy, with the costs, including those of the present appeal, and the solidary payment of $10,000 of attorney's fees for services rendered in first instance.

Mr. Chief Justice Negrón Fernández did not participate herein.

Mr. Justice Pérez Pimentel and Mr. Justice Santana Becerra agree that the damages be determined in the amount of two hundred thousand dollars but they dissent as to the contributory negligence attributed to the victim, engineer Piñero, because they understand that the evidence does not support said conclusion.